UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

BRADLEY MOTT,

*on behalf of himself and all other employees similarly
situated,*

*Plaintiffs,*

v.

NYU HOSPITALS CENTER, TISCH HOSPITAL,
RUSK INSTITUTE OF REHABILITATION
MEDICINE, NYU HOSPITAL FOR JOINT
DISEASES, ROBERT I. GROSSMAN, AND NANCY
SANCHEZ,

*Defendants.*

COMPLAINT- CLASS ACTION
AND DEMAND FOR JURY TRIAL

Civil Action No. 10-CV-2663

## NATURE OF CLAIM

1.     This is a proceeding for injunctive and declaratory relief and monetary damages to redress the deprivation of rights secured to plaintiff, Bradley Mott, individually, as well as all other employees similarly situated ("Class Members"), under the Fair Labor Standards Act of 1938 ("FLSA"), as amended, 29 U.S.C. § 201 *et seq.* and under the Racketeer Influenced and Corrupt Organizations ("RICO") Act, 18 U.S.C. § 1961 *et seq.*

## JURISDICTION AND VENUE

2.     The jurisdiction of this Court is invoked pursuant to 28 U.S.C. § 1331, 28 U.S.C. § 1343 (3) and (4) conferring original jurisdiction upon this Court of any civil action to recover damages or to secure equitable relief under any Act of Congress providing for the protection of civil rights; under 28 U.S.C. § 1337 conferring jurisdiction of any civil action arising under any Act of Congress regulating interstate commerce; under the Declaratory Judgment Statute, 28 U.S.C. § 2201; under 29 U.S.C. § 216(b); and under 18 U.S.C. §

1964(a) and (c).

3.      Venue is appropriate in the Southern District of New York since the allegations arose in this district and the Defendants reside in this district.

## CLASS ACTION ALLEGATIONS

4.      The claims arising under RICO are properly maintainable as a class action under Federal Rule of Civil Procedure 23.

5.      The class action is maintainable under subsections (1), (2) and (3) of Rule 23(b).

6.      The class consists of current and former employees of defendants who were injured by defendants' scheme to cheat employees out of their property and to convert the employees' property, including their wages and/or overtime pay, by misleading employees about their rights under the FLSA.

7.      The class size is believed to be over 6,500 employees.

8.      The Plaintiff will adequately represent the interests of the Class Members because they are similarly situated to the Class Members and their claims are typical of, and concurrent to, the claims of the other Class Members.

9.      There are no known conflicts of interest between the Plaintiff and the other Class Members.

10.      The Class Counsel, Thomas & Solomon LLP, is qualified and able to litigate the Plaintiffs' and Class Members' claims.

11.      The Class Counsel concentrates its practice in employment litigation, and its attorneys are experienced in class action litigation, including class actions arising under federal wage and hour laws.

12.     Common questions of law and fact predominate in this action because the claims of Plaintiffs and Class Members are based on whether defendants' policies and practices of not properly paying employees for all hours worked is a part of a scheme to defraud Plaintiffs in violation of RICO.

13.     The class action is maintainable under subsections (2) and (3) of Rule 23(b) because the Plaintiffs and Class Members seek injunctive relief, common questions of law and fact predominate among the Plaintiffs and Class Members and the class action is superior to other available methods for the fair and efficient adjudication of the controversy.

**PARTIES**

**A.     Defendants**

14.     Collectively, defendants NYU Hospitals Center, Tisch Hospital, Rusk Institute of Rehabilitation Medicine, NYU Hospital for Joint Diseases, Robert I. Grossman and Nancy Sanchez, (collectively, "Named Defendants") are related organizations through, for example, common membership, governing bodies, and trustees and/or officers.

15.     Named Defendants' health care facilities and centers include the following: Adult Spasticity Clinic, Anita Saltz Institute for Anxiety and Mood Disorders, Asperger Institute, Attention Deficit Disorder Center, Cardiac Catherization Laboratory at NYU, Cardiac and Vascular Institute, Cardiac Electrophysiology/Heat Rhythm Center, Center for AIDS Research, Center for Corporate Wellness, Center for Dementia Research, the Center for the Health of the African Diaspora, the Center for the Study of Asian American Health. the Center for Latino Health, the Center for Health and Human Rights, Center for the Prevention of Cardiovascular Disease, Cardiac Prevention and Rehabilitation Center, Center of Excellence on Brain Aging, Center of Excellence on Cancers of the Skin, Comprehensive

Multiple Sclerosis Care Center, Comprehensive Pain Treatment Center, Comprehensive Stroke Care Center, Dysautonomia Center, Echocardiography Laboratory, Functional Brain Imaging Laboratory, Harkness Center for Dance Injuries, Heart Failure Center, The Helen L. and Martin S. Kimmel Center for Biology and Medicine, Institute for Prevention Science, Institute for Attention Deficit Hyperactivity and Behavior Disorders, The Integrative Urological Center, Interventional Cardiology Laboratory, The Leon H. Charney Heart Rhythm Center, Neuromuscular Disease Center, Noninvasive Echocardiography Laboratory, Nuclear Cardiology/Stress Laboratory, NYU Alzheimer's Disease Center, NYU Aging and Dementia Clinical Research Center, NYU Cancer Center, NYU Cardiac and Vascular Institute, NYU Center for Brain Health, NYU Center for Neural Science, NYU Child Study Center, NYU Clinical Cancer Center Radiation Oncology Department, NYU Cochlear Implant Center, NYU Columbus Medical, NYU Comprehensive Epilepsy Center, NYU Fertility Center, NYU Fibroid Center, NYU Institute of Community Health and Research, NYU Langone Trinity Center, NYU Lung Cancer Biomarker Center, NYU Mary Lea Johnson Richards Organ Transplantation Center, NYU Pain Management Center, The NYU Parkinson and Movement Disorders Center, NYU Voice Center, The Pearl Barlow Center for Memory Evaluation and Treatment, Pediatric Infectious Diseases Clinic at Bellevue, Phyllis Green and Randolph Cowen Institute for Pediatric Neuroscience, Pulmonary Function Laboratory, Rusk Institute of Rehabilitation Medicine, Silberstein Alzheimer's Institute, Skirball Institute of Biomolecular Medicine, Stephen D. Hassenfeld Children's Center for Cancer & Blood Disorders, TB Clinic, Viral Hepatitis Clinic and Women's Heart Center (collectively "Health Centers").

      16.    Named Defendants affiliated health care facilities and centers include the

-4-

following: Bellevue Hospital Center, Friends of the Library of NYU School of Medicine, Inc., Gouverneur Healthcare Services, Interdisciplinary Melanoma Cooperative Group, Kids of NYU Foundation, Inc., Lenox Hill Hospital, Nathan S. Kline Institute for Psychiatric Research, Nelson Institute, New York City Free Clinic, North Shore University Hospital, NYU Cardiology Associates, NYU Dermatologic Associates, NYU Dermatologic Surgery Associates, NYU Imaging, Inc., NYU Pathology Associates, NYU Plastic Surgery Associates, LLP, NYU School of Medicine, NYU Urogynecology Associates, NYU Urology Associates, Pulmonary & Critical Care Associates, Rockland Children's Psychiatric Center, the Tamarind Foundation, Veterans Affairs Hospital, Tisch Hospital and Woodhull Medical Center (collectively, "Affiliates").

17.    Together the Named Defendants, the Health Centers and the Affiliates are referred to as "NYU Hospitals Center" or "defendants."

18.    NYU Hospitals Center is an enterprise engaged in the operation of a hospital and/or the care of the sick and is a healthcare consortium.

19.    Defendants operate over 60 health care facilities and centers and employ approximately 6,500 individuals.

20.    Defendants constitute an integrated, comprehensive, consolidated health care delivery system, offering a wide range of services.

21.    For example, defendants have centralized supply chain management, and financial, computer, payroll and health records systems that are integrated throughout their locations.

22.    Further, defendants' labor relations and human resources are centrally organized and controlled, including defendants' employment of one Vice President of Human

Resources as part of the management team, as well as the maintenance of system-wide policies and certain employee benefit plans.

23. Defendants share common management, including oversight and management by a senior executive team and board of directors.

24. Defendants have common ownership.

25. At all relevant times, NYU Hospitals Center has suffered or permitted Plaintiffs and Class Members to perform work for it at its various health care locations.

26. Plaintiffs and Class Members are or have been employed by NYU Hospitals Center and/or have been jointly employed by NYU Hospitals Center.

27. NYU Hospitals Center operates locations, either directly or indirectly through the Health Centers and Affiliates, and therefore is the employer of Plaintiffs and Class Members who are or were employed at all locations.

28. As such, defendants are the employer (single, joint or otherwise) of the Plaintiffs and Class Members and/or alter egos of each other.

29. In light of the economic realities of the enterprise operated by NYU Hospitals Center, NYU Hospitals Center is a joint employer of Plaintiffs and Class Members.

30. Collectively, NYU Hospitals Center comprises a single, integrated enterprise, as they perform related activities through common control for a common business purpose.

31. Defendants also engage in a joint venture for providing healthcare services by entering an agreement, established through their conduct in sharing the profits and losses.

32. Defendants jointly managed and controlled this venture as well as its employees and assets.

33. Defendants are jointly and severally liable to the class members for the

damages arising out of this joint venture.

34.    Robert I. Grossman, is the President and Chief Executive Officer ("CEO") of NYU Hospitals Center.

35.    Dr. Grossman's responsibilities include actively managing NYU Hospitals Center.

36.    In concert with others, Dr. Grossman has the authority to, and does, make decisions that concern the policies defendants adopt and the implementation of those policies.

37.    In concert with others, Dr. Grossman has the authority to, and does, make decisions that concern defendants' operations, including functions related to employment, human resources, training, payroll, and benefits.

38.    Due in part to his role as President, Dr. Grossman is actively involved in the creation of the illegal policies complained of in this case.

39.    Due in part to his role as President, Dr. Grossman actively advises defendants' agents on the enforcement of the illegal policies complained of in this case.

40.    Due in part to his role as President, Dr. Grossman actively ensures defendants' compliance or non-compliance with federal law, including the requirements of the FLSA and RICO.

41.    In concert with others, Dr. Grossman has the authority to, and does, make decisions that concern the reviewing and counseling of defendants regarding employment decisions, including hiring and firing of Plaintiffs and Class Members.

42.    In concert with others, Dr. Grossman has the authority to, and does, make decisions that concern employees' schedules, hours and standard benefit levels.

43.    Dr. Grossman has the authority to, and does, make decisions that concern standard pay scales.

44.    Dr. Grossman has the authority to, and does, make decisions that concern defendants' human resources policies, the resolution of issues and disputes regarding policies and their applications, the counsel locations receive regarding human resources issues, and communications with employees about human resources issues and policies.

45.    Dr. Grossman has the authority to, and does, make decisions that concern defendants' employment and human resources records, including the systems for keeping and maintaining those records.

46.    Dr. Grossman has the authority to, and does, make decisions that concern training and education functions across NYU Hospitals Center.

47.    Dr. Grossman has the authority to, and does, make decisions that concern the type and scope of training employees must attend as well as any compensation they receive for attending training.

48.    Dr. Grossman has the authority to, and does, make decisions that concern payroll functions across NYU Hospitals Center.

49.    Dr. Grossman has the authority to, and does, make decisions that concern the system for keeping and maintaining employees' payroll records, the timing and method with which payment is conveyed to employees, and the manner and method in which employees receive payroll information including their payroll checks.

50.    Dr. Grossman has the authority to, and does, make decisions that concern benefit plans across NYU Hospitals Center.

51.    Dr. Grossman has the authority to, and does, make decisions that concern the

type and scope of benefits available to employees, the method and manner in which information regarding those plans is conveyed to employees, and the system for keeping and maintaining records related to employees' benefits.

52.     Because Dr. Grossman has authority to hire or fire employees, provide and direct support regarding human resources issues, including the hiring and firing of Plaintiffs and Class Members, and control the drafting and enforcement of the policies which govern the hiring and firing of employees, Dr. Grossman has the power to hire and fire employees.

53.     Because Dr. Grossman has authority to establish work schedules and/or conditions of employment, provide and direct support regarding human resources issues, including work schedules and/or conditions of employment, control the drafting and enforcement of the policies which govern employees' schedules and/or conditions of employment, establish the type and scope of training employees receive, and administer employees' benefit programs, including standard benefit levels and the type and scope of benefits available to employees, Dr. Grossman supervises and controls employees' work schedules and/or conditions of employment.

54.     Because Dr. Grossman has authority to establish employees' rate and method of payment and centrally control payroll functions, including standard pay scales, the provision of payroll information, and the timing of payment, Dr. Grossman determines the rate and method of employees' payment.

55.     Because Dr. Grossman has authority with respect to defendants' centralized records, including a database regarding employees' employment records, and systems for keeping and maintaining payroll, benefits, and other employment-related records, Dr. Grossman maintains employees' employment records.

56.     Because Dr. Grossman provides day-to-day support regarding human resources issues, including employees' work schedules and/or conditions of employment, controls the drafting and enforcement of the policies which govern employees' schedules and/or conditions of employment, and administers employees' benefit programs, he is affirmatively, directly, and actively involved in operations of the defendants' business functions, particularly in regards to the employment of Plaintiffs and Class Members.

57.     Because Dr. Grossman is actively involved in the creation of the illegal policies complained of in this case, actively advises defendants' agents on the enforcement of the illegal policies complained of in this case and actively ensures defendants' compliance or non-compliance with federal law, including the requirements of the FLSA and RICO, he actively participates in the violations complained of in this action.

58.     Based upon the foregoing, Dr. Grossman is liable to Plaintiffs and Class Members because of his active role in operating the business, his status as an employer, and/or according to federal law.

59.     Nancy Sanchez is the Senior Vice President and Vice Dean, Human Resources for NYU Hospitals Center.

60.     Ms. Sanchez is responsible for, provides direction and control over, and is authorized to direct all aspects of human resources functions across NYU Hospitals Center.

61.     Due in part to her role of overseeing human resources, training and education, and payroll and commission services, in concert with others, Ms. Sanchez is actively involved in the creation of the illegal policies complained of in this case.

62.     Due in part to her role of overseeing human resources, training and education, and payroll and commission services, in concert with others, Ms. Sanchez actively advises

defendants' agents on the enforcement of the illegal policies complained of in this case.

63.     Due in part to her role of overseeing human resources, training and education, and payroll and commission services, in concert with others, Ms. Sanchez actively ensures defendants' compliance or non-compliance with federal law, including the requirements of the FLSA and RICO.

64.     Ms. Sanchez is actively involved in reviewing and counseling defendants regarding employment decisions, including hiring and firing of Plaintiffs and Class Members.

65.     Ms. Sanchez is actively involved in decisions that set employees' schedules, hours and standard benefit levels.

66.     Ms. Sanchez is actively involved in decisions that set standard pay scales.

67.     Ms. Sanchez is actively involved in the determination and drafting of human resources policies, the resolution of issues and disputes regarding policies and their application, the counseling locations receive regarding human resources issues, and communications with employees about human resources issues and policies.

68.     Ms. Sanchez is actively involved in defendants' employment and human resources records, including the systems for keeping and maintaining those records.

69.     Ms. Sanchez is actively involved in training and education functions across NYU Hospitals Center.

70.     Ms. Sanchez is actively involved in determining the type and scope of training employees must attend as well as any compensation they receive for attending training.

71.     Ms. Sanchez is actively involved in payroll functions across NYU Hospitals Center.

72.     Ms. Sanchez is actively involved in the system for keeping and maintaining

-11-

employees' payroll records, the timing and method with which payment is conveyed to employees, and the manner and method in which employees receive payroll information, including their payroll checks.

73.     Ms. Sanchez is actively involved in benefit plans across NYU Hospitals Center.

74.     Ms. Sanchez is actively involved in determining the type and scope of benefits available to employees, the method and manner in which information regarding those plans is conveyed to employees, and the system for keeping and maintaining records related to employees' benefits.

75.     Because Ms. Sanchez has authority to hire or fire employees, provide and direct support regarding human resources issues, including the hiring and firing of employees, and control the drafting and enforcement of the policies which govern the hiring and firing of employees, Ms. Sanchez has the power to hire and fire employees.

76.     Because Ms. Sanchez has authority to establish work schedules and/or conditions of employment, provide and direct support regarding human resources issues, including work schedules and/or conditions of employment, control the drafting and enforcement of the policies which govern employees' schedules and/or conditions of employment, establish the type and scope of training employees receive, and administer employees' benefit programs, including standard benefit levels and the type and scope of benefits available to employees, Ms. Sanchez supervises and controls employees' work schedules and/or conditions of employment.

77.     Because Ms. Sanchez has authority to establish employees' rate and method of payment and centrally control payroll functions, including standard pay scales, the provision of payroll information, and the timing of payment, Ms. Sanchez determines the rate and

method of employees' payment.

78.     Because Ms. Sanchez has authority with respect to defendants' centralized records, including a database regarding employees' employment records, and systems for keeping and maintaining payroll, benefits, and other employment-related records, Ms. Sanchez maintains employees' employment records.

79.     Because Ms. Sanchez provides day-to-day support regarding human resources issues, including employees' work schedules and/or conditions of employment, controls the drafting and enforcement of the policies which govern employees' schedules and/or conditions of employment, and administers employees' benefit programs, she is affirmatively, directly, and actively involved in operations of defendants' business functions, particularly in regards to the employment of Plaintiffs and Class Members.

80.     Because Ms. Sanchez is actively involved in the creation of the illegal policies complained of in this case, actively advises defendants' agents on the enforcement of the illegal policies complained of in this case and actively ensures defendants' compliance or non-compliance with federal law, including the requirements of the FLSA and RICO,  Ms. Sanchez actively participates in the violations complained of in this action.

81.     Based upon the foregoing, Ms. Sanchez is liable to Plaintiffs and Class Members because of her active role in operating the business, her role in the violations complained of in this action, her status as an employer, and/or otherwise according to federal and state law.

**B.     Plaintiffs**

*Named Plaintiff*

82.     At all relevant times, Bradley Mott ("Plaintiff") was an employee under the

FLSA and employed within this District.

### Class Members

83.     The Class Members are those employees of defendants who were suffered or permitted to work by defendants and not paid their regular or statutorily required rate of pay for all hours worked.

## FACTUAL BACKGROUND

84.     NYU Hospitals Center is a large health care provider in New York.

85.     As discussed below, defendants maintained several illegal pay policies that denied Plaintiffs and Class Members compensation for all hours worked, including applicable premium pay rates.

### Meal and Break Deduction Policy

86.     Pursuant to defendants' "Meal and Break Deduction Policy," defendants' computerized timekeeping system automatically deducts time from employees' paychecks each day for a meal, break or other reasons.

87.     Despite having this policy, defendants do not ensure that Plaintiffs and Class Members perform no work during the breaks.

88.     Plaintiffs and Class Members do in fact perform work during those breaks and are not paid for that time.

89.     Defendants know that the Plaintiffs and Class Members perform work during these unpaid breaks, but still do not pay them for this time pursuant to their Meal and Break Deduction Policy.

90.     Defendants maintain the Meal and Break Deduction Policy throughout their facilities and centers.

91.    Plaintiffs and Class Members allow defendants to operate on a 24/7 basis, and in doing so, Plaintiffs and Class Members often perform compensable work for defendants during their uncompensated meal breaks.

92.    Defendants do not prohibit Plaintiffs and Class Members from working during their meal breaks and do not have rules against such work.

93.    Although defendants' policy deducts time each shift, defendants expect Plaintiffs and Class Members to be available to work throughout their shifts and consistently require their employees to work during their unpaid breaks.

94.    Plaintiffs and Class Members are not relieved by another employee when their break comes, or asked to leave their work location.

95.    Defendants know that Plaintiffs and Class Members perform work during their unpaid breaks.

96.    For example, Plaintiffs and Class Members perform work for the defendants, on defendants' premises, in plain sight, and at management's request.

97.    Defendants' management has repeatedly observed Plaintiffs and Class Members working though their unpaid breaks. Defendants' management has gone so far as to direct Plaintiffs and Class Members to work during their unpaid breaks even though defendants' management knew that they would not be able to have a full break.

98.    Plaintiffs and Class Members had conversations with defendants' managers in which they discussed how they were working through their meal or other breaks and were not getting paid for such work.

99.    When questioned by employees about the Meal and Break Deduction Policy, the defendants affirmatively stated that the employees were being fully paid for the work

time for which they were entitled to be paid, even though defendants knew compensable work time was being excluded from the employees' pay. Such conversations occurred with Plaintiffs and Class Members on a number of occasions. These representations were part of a course of conduct (see e.g., ¶¶ 113-117, 133-143) to defraud Plaintiffs and Class Members from the pay they were owed, and to mislead them into believing they had been fully paid as required by law.

100. Further, given the demands of the health care industry and short staffing, defendants' management knew that to get the tasks done they assigned to Plaintiffs and Class Members, when they needed to get done, Plaintiffs and Class Members had to work through their unpaid breaks, even during times they were not paid for their breaks.

101. Even though defendants know their employees are performing such work, defendants fail to compensate their employees for such work.

102. All Plaintiffs and Class Members are subject to the Meal and Break Deduction Policy and are not fully compensated for work they perform during breaks, including, without limitation, hourly employees working at NYU Hospitals Center's facilities and centers, such as secretaries, housekeepers, custodians, clerks, porters, registered nurses, licensed practical nurses, transport nurses, nurse aides, administrative assistants, anesthetists, clinicians, medical coders, medical underwriters, nurse case managers, nurse interns, nurse practitioners, nurse aides, practice supervisors, professional staff nurses, quality coordinators, resource pool nurses, respiratory therapists, senior research associates, operating room coordinators, surgical specialists, admissions officers, student nurse techs, trainers, transcriptionists, occupational therapists, occupational therapy assistants, physical therapists, physical therapy assistants, radiation therapists, staff therapists, angiotechnologists, x-ray technicians, CAT scan

technicians, mammographers, MRI technologists, sleep technologists, surgical technologists, radiographers, phlebotomists, respiratory technicians, respiratory care specialists, respiratory care practitioners, clinical coordinators, medical assistants, home care nurses, home health aides, clinical case managers, midwives and other health care workers.

103.    Plaintiffs and Class Members are entitled to compensation for all time they performed work for defendants, including during their unpaid breaks.

104.    In addition, if Plaintiffs' and Class Members' hours had been properly calculated, the time spent working during unpaid breaks often would include work that should have been calculated at applicable premium pay rates.

105.    Plaintiffs and Class Members subject to the Meal and Break Deduction Policy are members of Subclass 1.

### Unpaid Preliminary and Postliminary Work Policy

106.    Defendants suffered or permitted Plaintiffs and Class Members to perform work before and/or after the end of their scheduled shifts.

107.    However, defendants failed to pay Plaintiffs and Class Members for all time spent performing such work as a result of defendants' policies, practices and/or time recording system (the "Unpaid Preliminary and Postliminary Work Policy").

108.    In addition, if Plaintiffs' and Class Members' hours had been properly calculated, the time spent performing work before and/or after their shifts often would have included work that should have been calculated at applicable premium pay rates.

109.    Plaintiffs and Class Members subject to the Unpaid Preliminary and Postliminary Work Policy are members of Subclass 2.

### Additional Allegations

-17-

110.    Plaintiffs and Class Members were subject to defendants' timekeeping policies which fail to ensure that employees are compensated for all hours worked, including pursuant to the Unpaid Work Policies.

111.    Even though NYU Hospitals Center knows its employees are performing such work, NYU Hospitals Center fails to compensate its employees for such work.

112.    Defendants' practice is to be deliberately indifferent to these violations of the statutory wage and overtime requirements.

113.    Through the paystubs and payroll information it provided to employees, NYU Hospitals Center deliberately concealed from its employees that they did not receive compensation for all compensable work that they performed and misled them into believing they were being paid properly.

114.    Further, by maintaining and propagating the illegal Unpaid Work Policies, defendants deliberately misrepresented to Plaintiffs and Class Members that they were being properly paid for all compensable time, even though Plaintiffs and Class Members were not receiving pay for all time worked including applicable premium pay.

115.    The defendants engaged in such conduct and made such statements to conceal from the Plaintiffs and Class Members their rights and to frustrate the vindication of the employees' federal rights.

116.    As a result, employees were unaware of their claims.

117.    Defendants' failure to pay overtime as required by the FLSA is willful.

118.    Defendants, however, at all times, intended to violate applicable federal laws by failing to pay Plaintiffs and Class Members their regular or statutorily required rate of pay for all hours worked including applicable premium pay.

-18-

119. Among the relief sought, Plaintiffs and Class Members seek injunctive relief to prevent defendants from continuing the illegal policies and practices perpetuated pursuant to the Unpaid Work Policies.

120. Defendants failed to keep accurate records of all time worked by Plaintiffs and Class Members.

121. As used in this Complaint, "mailed" means: (1) placing in any post office or authorized depository for mailed matter, any matter or thing to be delivered by the United States Postal Service; (2) causing to be deposited any matter or thing to be delivered by any private or commercial interstate carrier; (3) taking or receiving therefrom any such matter or thing; and/or (4) knowingly causing to be delivered by any such means any such matter.

122. Plaintiffs and Class Members allege that defendants devised, intended to devise, and carried out a scheme to cheat Plaintiffs and Class Members out of their property and to convert Plaintiffs and Class Members' property, including their wages and/or overtime pay (the "Scheme"). Defendants' Scheme consisted of illegally, willfully and systematically withholding or refusing to pay Plaintiffs and Class Members their regular or statutorily required rate of pay for all hours worked in violation of federal law, as described previously in this Complaint.

123. Defendants' Scheme involved the employment of material misrepresentations and/or omissions and other deceptive practices reasonably calculated to deceive Plaintiffs and Class Members. The Scheme involved depriving Plaintiffs and Class Members of their lawful entitlement to wages and overtime.

124. In executing or attempting to execute the Scheme and to receive the financial benefits of the Scheme, defendants repeatedly mailed payroll checks, either directly to

Plaintiffs and Class Members or between defendants' business locations. These mailings occurred on a regular basis and more than 100 such mailings occurred in the last 10 years.

125.    The payroll checks were false and deceptive because they misled Plaintiffs and Class Members about the amount of wages to which they were entitled, and whether defendants had included all compensable work time, as well as their status and rights under the FLSA. Plaintiffs and Class Members relied to their detriment on the misleading payroll checks that defendants mailed and those misleading documents were a proximate cause of Plaintiffs and Class Members' injuries.

126.    Defendants' predicate acts of mailing the misleading payroll checks in furtherance of their Scheme constitute a pattern of conduct unlawful pursuant to 18 U.S.C. § 1961(5) based upon both the relationship between the acts and continuity over the period of time of the acts. The relationship was reflected because the acts were connected to each other in furtherance of the Scheme. Continuity was reflected by both the repeated nature of the mailings during and in furtherance of the Scheme and the threat of similar acts occurring in the future. The threat was reflected by the continuing and ongoing nature of the acts.

127.    Defendants' predicate acts were related, because they reflected the same purpose or goal (to retain wages and overtime pay due to Plaintiffs and Class Members for the economic benefit of defendants and members of the enterprise); results (retention of wages and overtime pay); participants (defendants and other members of the enterprise); victims (Plaintiffs and Class Members); and methods of commission (the Scheme and other acts described in the Complaint). The acts were interrelated and not isolated events, since they were carried out for the same purposes in a continuous manner over a substantial period of time.

-20-

128.   At all relevant times, in connection with the Scheme, defendants acted with malice, intent, knowledge, and in reckless disregard of Plaintiffs and Class Members' rights.

129.   Each of the Plaintiffs and Class Members is a "person" within the meaning of 18 U.S.C. §§ 1961(3) and 1964.

130.   Each defendant is a "person" within the meaning of 18 U.S.C. §§ 1961(3) and 1962(c).

131.   Defendants were members of an "enterprise" under 18 U.S.C. §§ 1961(4) and 1962(a), which was engaged in or the activities of which affected interstate and foreign commerce.

132.   Each defendant received income from a pattern of conduct unlawful under RICO, in which defendants participated through continuous instances of providing Plaintiffs and Class Members with misleading documents which defendants mailed and upon which Plaintiffs and Class Members relied to their detriment.

133.   Plaintiffs and Class Members were injured in their business and property under 18 U.S.C. § 1964(c) by reason of defendants' commission of conduct which was unlawful under RICO.

134.   Every wage payment that the defendants mailed to the Plaintiffs and Class Members as part of the Scheme constituted a new legal injury to the Plaintiffs and Class Members.

135.   Therefore, each and every improper payment within the relevant statute of limitations period constitutes a new legal injury and the Plaintiffs and Class Members are entitled to recover based on the reduction in each improper payment.

136.   Additionally, as set forth in the allegations above, including ¶¶ 99, 113-117,

-21-

the defendants fraudulently concealed from the Plaintiffs and Class Members the facts that are the basis for their claims. Further, such conduct by the defendants equitably tolls the statute of limitations covering Plaintiffs and Class Members' claims.

137.    Because of such conduct, the Plaintiffs and Class Members did not discover in the relevant statute of limitations period that the defendants were not paying them properly.

138.    The Plaintiffs and Class Members exercised due diligence, but still were unaware of their rights.

139.    The Plaintiffs and Class Members are not experts in proper payment under federal labor laws, and more specifically are not aware of what time is compensable for interrupted and missed meal breaks, nor how the defendants' internal computer systems were determining the amount they were being paid.

140.    Further, when questioned, the defendants falsely assured Plaintiffs and Class Members that the defendants understood federal and state labor laws and that based on that knowledge, the defendants were ensuring that they were properly paying the Plaintiffs and Class Members.

141.    The defendants made this representation despite the fact that such claims were false, fully knowing that Plaintiffs and Class Members were relying on the defendants' "expertise" and assurances.

142.    Further, these assurances were not contradicted by the information in legal postings required by state or federal law to be displayed prominently at places of work to which Plaintiffs and Class Members had access.

143.    Prior to seeking legal advice from Class Counsel, the Plaintiffs were never alerted to the defendants' concealment of their violation of the law by failing to pay the

Plaintiffs and Class Members properly.

144.   Further, not until the commencement of this action were the Plaintiffs or Class Members made aware that the defendants' conduct in fact violated the law.

145.   Plaintiffs and Class Members were not classified as exempt employees because hourly employees do not fall under one of the enumerated exemptions under the FLSA.

## FIRST CAUSE OF ACTION
### *FLSA*

146.   Plaintiffs and Class Members reallege the above paragraphs as if fully restated herein.

147.   Defendants willfully violated their obligations under the FLSA and are liable to Plaintiffs and Class Members.

## SECOND CAUSE OF ACTION
### *RICO*

148.   Plaintiffs and Class Members reallege the above paragraphs as if fully restated herein.

149.   Plaintiffs and Class Members bring these claims under 18 U.S.C. § 1964(c), which confers on private individuals the right to bring suit for any injury caused by a violation of 18 U.S.C. § 1962.

150.   Defendants' conduct, and the conduct of other members of the enterprise, injured Plaintiffs and Class Members by refusing to pay their regular or statutorily required rate of pay for all hours worked.  Defendants conducted or participated, directly or indirectly, in the conduct of the enterprise's affairs through a pattern of racketeering activity, by devising a Scheme to obtain Plaintiffs' and Class Members' property by means of false or fraudulent representations, at least some of which were made in the misleading payroll checks

-23-

which defendants mailed.

**WHEREFORE**, Plaintiffs and Class Members demand judgment against defendants in their favor and that they be given the following relief:

(a)     an order preliminarily and permanently restraining defendants from engaging in the aforementioned pay violations;

(b)     an award crediting Plaintiffs and Class Members for all hours worked;

(c)     an award of the value of Plaintiffs' and Class Members' unpaid wages;

(d)     liquidated damages under the FLSA equal to the sum of the amount of wages and overtime which were not properly paid to Plaintiffs and Class Members;

(e)     an award of reasonable attorneys' fees, expenses, expert fees and costs incurred in vindicating Plaintiffs' and Class Members' rights;

(f)     an award of pre- and post-judgment interest; and

(g)     such other and further legal or equitable relief as this Court deems to be just and appropriate.

## JURY DEMAND

Plaintiffs demand a jury to hear and decide all issues of fact in accordance with Federal Rule of Civil Procedure 38(b).

Dated: March 24, 2010

THOMAS & SOLOMON LLP

By: _____

Justin M. Cordello, Esq.
PA#209838
*Attorney for Plaintiffs and Class Members*
693 East Avenue
Rochester, New York 14607
Telephone:  (585) 272-0540
jcordello@theemploymentattorneys.com